Thank you. I'm Glenn Westrich from Nixon Peabody, appearing for the appellant, Hank Spacone, trustee of the At Home General Unsecured Creditors Liquidating Trust. Before I get started, I'd like to reserve five minutes at the end for rebuttal. Okay. Just keep in mind that when it gets down to five, that's the time you have left. I will. Thank you. Before I get to addressing the district court's order from which we're appealing, I thought it might be helpful to start with a little bit of a history of what At Home Corporation was and how we ended up with this unique trust beneficiary ownership structure, which is really at the center of this dispute and really drives how the contracts that we're talking about ought to be interpreted. At Home was one of the highest flyers of the dot-com boom of the 1990s. The Excite portal rivaled Yahoo and Microsoft at the time in users and revenues. If you have broadband Internet at home through your cable provider, you're probably using at-home technology and you're probably actually using the network that it built at its expense. The company developed what is considered in the valley now to be an almost legendary portfolio of patents covering search engines and Internet technology. And at its peak, At Home had a market capitalization of around $40 billion. By late 2001, this had all come crashing down, arguably as a result of the misconduct of the company's controlling shareholders, AT&T, Cox, and Comcast. The company filed bankruptcy in September 2001 and by early the following year was completely out of business. Following the bankruptcy filing as a result of conflicts of interest, the unsecured creditors group broke into two constituencies representing the trade creditors and At Home's bondholders. My client, the At Home General Unsecured Creditors Liquidating Trust, represents the trade creditors, the employees and other vendors who basically had outstanding bills as of the time the bankruptcy was filed. Just for simplicity's sake, as we get into talking about the three trusts, I'll refer to the General Unsecured Trust as G. The other creditor group, the Bondholders Trust, we'll call them B, represented bondholders, people who owned bonds as of the bankruptcy filings or bought them in the resale market subsequent to the bankruptcy. During the bankruptcy proceeding, B and G's predecessors, along with the debtor, At Home, negotiated a settlement agreement, and that settlement agreement specified precisely where all of At Home's assets were to go. Under the agreement, each of the beneficiary trusts, B and G, received more than $100 million, and then they each received another piece of what was considered to be a very substantial asset, and that was litigation rights. These litigation rights included what everyone thought at the time were the crown jewels of the At Home asset pool, the litigation rights against the controlling shareholders, ATT, Cox, and Comcast. But B got more than that. It also received the right to sue ATT and the others and some related parties for everything else, including IP litigation. My client's distribution, G's litigation distribution, was called the estate litigation, and essentially it included the right to sue everyone else in the world for anything else. That is, we received the right to pursue all claims and causes of action, including claims and causes of action arising over At Home's intellectual property. Did you get also the right to issue non-exclusive licenses and settlement of those claims? I think we did, Your Honor. Is that what this case is all about? It's exactly what this case is all about, and I'm about to get to that. We've got an unfortunate situation here where there are conflicts. You just couldn't have one trust, so you did the best you could at the time. But essentially, there's a lot of money involved here, and it's a big case, but it comes down to a pretty simple issue. There's a contract. We apply California law to the contract, right? I agree. So tell us why you believe that you have the right to issue licenses. It seems to me that's left out, and one of the things that concerns me, and maybe you can clarify it, is you keep saying that we pursue litigation. We have to be able to provide licenses, but there's never a citation to the record. There's a citation to a couple of textbooks, and that isn't going to help me very much, I don't think, in determining the California law of the contract. So if you could bear that in mind during your discussion, I'd be grateful. I haven't made up my mind. I just don't understand it. I'd be glad to. And the reason, Your Honor, that there's no citation in the record as to licenses in connection with either the negotiation of the settlement agreement, which I think is the core document here, or the plan of liquidation, which is the document that implemented the settlement agreement and incorporates it as Exhibit A, is because that particular aspect of how litigation would likely proceed simply was not something that the parties specified. And that's the reason why we have a contract here, the settlement agreement and plan as it's incorporated, in which there's an ambiguity. What the contract provides is that we, G, receive all proceeds from all claims and causes of action, including claims or causes of action for intellectual property. So the question really comes down to, under California law, do you interpret proceeds to include proceeds derived from settlements? And if so, can those proceeds include proceeds derived from settlements that comprise, in part, licenses? Counsel, what do you do with the provision in the at-home agreement, which expressly provides for licensing by the at-home liquidating trust? What do you do with that? Well, it's actually, if you put all the agreements together, they're completely consistent with each other. The at-home trust agreement provides for how the at-home trust is to dispose of assets that it receives. The source of wealth is the settlement agreement. The trust agreements describe operationally how each of the trusts is to use that wealth. But would it be fair to say the at-home trust is kind of the umbrella trust? Well, I don't think so. What was going on here is, as I said a minute ago, the bondholders' trust, B, received the rights to sue AT&T, Cox and Comcast for everything in the world. We received the right to sue everybody else for everything in the world. No one knew at the time the plan was approved by the bankruptcy court, which patents were going to read on which defendants. And, in fact, it was possible that some patents might read on both AT&T and, say, Microsoft. That is, they might read on target defendants that each group got. So the organization was created to have A, the successor to the debtor, hold the assets, including the patents, and to have G and B, which are the beneficial owners of the patents. It's really the patents are our property. They're simply being held by A, the way a lawyer might hold a miner's property until he reaches the age of maturity. Would the Federal Circuit agree with that? Well, the Federal Circuit agreement, I think, made a couple of mistakes. And one of them was that they didn't fully recognize what the real organization between the three trusts here is. And the important feature of these three trusts, and what I was hoping to get to, Your Honors, in describing the sort of background and context, is that A is not the umbrella. A is simply the lawyer in the Wall Street office holding the race for the miner until he reaches maturity. But the ownership here is in B and G. And it's actually stronger than that, because B and G are given express rights to direct A. And that's the important distinction that the Federal Circuit missed and that Judge Patel at the district court missed. The trust agreements and the settlement agreements specifically provide that the beneficiary trusts, B and G, instruct A as to how to proceed with respect to litigation. Can instruct? Can instruct, yes. Well, that gives them an opportunity. But do they control it? All it says is can instruct. They absolutely control. The way it works is this. The patents are put into ownership, fee ownership, by A, with the beneficial owners being B and G. Or is that in the language of the agreement that B and G are beneficial owners of the licenses? It's not beneficial owners of licenses. Beneficial owners of the patents. In other words, the patents are owned by B and G. And where can we verify? Trust, but verify. Where can we verify that? That's in the at-home trust agreement. And if you look at, for example, paragraphs of the patent. Give us a specific language that says that G and B are beneficial. Owners of the patents. Owners of the patents. The exact language that says that. If I perhaps, I'll find it and perhaps if I can cite to that language in rebuttal, I will. Well, that's pretty key, isn't it? I mean, to your argument. It is. You don't have it at your fingertips? Well, what I have at my fingertips is that. Maybe the other side will stipulate to it. Under paragraphs 1.1 and 3.2 of the at-home trust agreement, the at-home trustee is required to fully and promptly cooperate, assist and join in actions and execute any necessary papers for actions brought by the beneficiary trust. That doesn't get you there. So we trust everybody, but we verify everything. I will get you the specific language. Well, you'll have time at your rebuttal to give it to us. What do we do with the Federal Circuit? They've come down here at the very end, and some of the issues seem very close. Is it compulsory that we follow the Federal Circuit? Do we consider it persuasive, or do we just tell them they don't know what they're talking about? I don't think. Well, first of all, let me say that we filed a petition for rehearing as to the Federal Circuit's decision, and we made it past the first hurdle. They've asked Microsoft to respond to it, so that case remains pending. Claiming that B&G are the beneficial owners of the patents? No, claiming that B&G have the right to direct A as the beneficial owners of the patents, and therefore we fall into the category of parties like exclusive licensees who have standing to sue for patent infringement. But just assuming they stay where they are, what do we do with the opinion? Okay. Assuming they stay where they are, there's two aspects to it that I think are important. First of all, what the Federal Circuit found is that G, my client, lacks constitutional standing to appear as a plaintiff in a patent lawsuit. They explicitly declined to find whether or not A, the fee owner of the patents, can appear as a plaintiff. Under the language I just read to you from the at-home trust agreement, B&G can cause A to join in litigation. That is, litigation can still be brought with A being denominated as the plaintiff. And that really emphasizes the importance of how this organizational structure was designed. The control is in the beneficiaries. The at-home trust is simply the holder for the benefit of the beneficiaries. I think if you'd said that in the initial agreement, I don't think there'd be any problem with this now. And I don't get how we can make that jump from what was actually in the agreement to what you're saying. Clearly you had the ability to set this up in the original settlement agreement. But we have to do these inferences, and it sounds like to me that the Federal Circuit didn't quite buy your argument. Well, I think it was a different argument. The first argument was do they the only issue the Federal Circuit was looking at was standing. And what they said was there's essentially two categories of plaintiffs who have standing, fee owners and exclusive licensees. Neither B nor G is either fee owner, because the fee is held by the at-home trust for the benefit of B&G, or an exclusive licensee. Instead, we are kind of a hybrid. We have the right to control A, we have the right to control litigation, and we have beneficial ownership. The majority found that that was not sufficient. The dissent obviously disagreed pretty strongly with that. But that's where they ended up. As far as licensing, which is the issue here, I mean, the prime issue we're here to talk about today is who is the beneficiary. Who controls the at-home trust? Who receives the benefit of litigation? And where do the proceeds go? And even though the Federal Circuit mentioned that only A has the right to license, as the dissent pointed out, they were simply relying on Judge Patel's decision, which was the state of this case at the time. But even, let's say that we stipulate to that, that only A has the right to grant licenses. And actually, I think that's the correct analysis. Only A does. They're the fee owner. That's the reason why, in the initial motion that was filed in this matter, we didn't ask to be the grantor of patent licenses. We asked the court to clarify that we have the right to instruct A, pursuant to the provision I just read, to grant licenses as a part of settlements of lawsuits. And there's nothing inconsistent with the Federal Circuit's decision in that case, and the notion that the A, that the A trust, which was really set up simply to disqualify the beneficiary, to do the bidding of B and G, can be directed. Well, counsel, isn't there a difference between directing A to grant the license and instructing? Isn't there a difference? You say you have the right to direct, which means that you can order them and they have to do it. Instructing is different. That's not a mandatory thing. So are you saying that the ---- It's mandatory. Under the provisions that I read from paragraphs 1.1 and 3.3, if either of the beneficiary trusts instructs A to execute documents, they must do so. And I'd refer you to 1.1A and 3.2A and 3.3G of the trust agreements, which specifically go into those matters. So, but that argument only works if you have the right to grant a license, though. Well, that gets back to the question of what are proceeds. And it follows that licenses, non-exclusive licenses, are proceeds, because intellectual property litigation was specifically mentioned in the definition of estate litigation and in the definition of controlling surety. But it was not listed in the definition of proceeds, right? That's right. That's why we have to go to extrinsic evidence to figure out what proceeds are. And the extrinsic evidence here is overwhelming, that proceeds include non-exclusive licenses. And if we're getting into extrinsic evidence, and I think we have to, I'd point out that Judge Carlson, the bankruptcy judge who presided over this matter, after carefully reviewing all this, concluded that they do. And his opinion is entitled to deference in the absence of clear error. And none has been pointed out. I thought we reviewed de novo. You're reviewing Judge Patel's decision, which was a matter of law de novo. But if you throw that out, then I think you're left with Judge Carlson's decision. I think we set aside the district court and we look just at the bankruptcy court in our review now. With deference, though? Well, his decision was a mixed decision of law and fact. He reviewed all of the facts, and his conclusion was, having reviewed the extrinsic evidence. I think our review there is de novo except for factual determinations, which is clear error. And you have three minutes left. All right. I will defer my time for rebuttal. Thank you. Good afternoon. Max Litvack, Pachulski, Stang, Zeal, and Jones, on behalf of Richard Williamson, the trustee of the Bar Association. You should know that our acoustics are very poor in this room. Keeping your voice up would be very helpful. Certainly, Your Honor. Thank you. I really just want to focus on two issues, which I think the Court just touched on in questioning the appellant. The first issue is collateral estoppel, which is the issue that we raised in our supplemental submission to the Court based on the Federal Circuit's recent decision. Is it final? We believe it's final, Your Honor, for purposes of issue preclusion. For purposes of issue preclusion. Yes. So it's not final. It's partially final or for some purposes final. Is there a petition for re-hearing pending in the Federal Circuit tomorrow? I don't know, but I understand from appellants that they have filed a petition for re-hearing. But in my examination of Ninth Circuit precedent, it is final for purposes of issue preclusion, and I would actually refer the Court to. Well, if there's a mandate, maybe not even, hasn't probably even issued. If there's a pending petition for re-hearing, my guess would be that no mandate is issued in that case. But they have issued a published opinion, which is a well-reasoned. Yeah, but no mandate is issued. You know what that means? Yes, Your Honor. What does it mean? Case is still at play. Yes, Your Honor. I think on this point, what I would do is refer the Court to Hawkins v. Riceley, which is a Ninth Circuit decision, 984 F. 2nd. 321. The ruling is essentially that even though a motion for re-hearing may be pending or an appeal may be pending, the decision is still final for purposes of issue preclusion. So we're bound by that decision, according to you, no matter what we do? Well, I don't know if we would go quite that far, Your Honor. I would just say that the appellants are bound, that they are collaterally stopped from arguing and re-litigating the same issues that they litigated and already lost at the Federal Court. And what issues are those? It's the precise issue in this appeal, which is that the General Creditor's Trust, the G, has no right to license, sub-license or collect royalties from licenses of at-homes intellectual property. The Federal Circuit found that. They even went one step further, and they found that the General Creditor's Trust has no right to forgive or waive prohibited activities under a patent. Stated simply, they have no rights to exclude under a patent. Why did the Federal Circuit make a distinction between the issues on appeal in this case and the issues before it? I'm not sure that they made a distinction. I think they recognized that this issue was pending before this Court, and yet they went ahead and decided the way that they felt that they needed to decide in order to get to the issue of standing, which was at the heart of their appeal. Because they said the issue before them involved standing, and the issue before us involved the issue of whether GUCLT has an independent right to license the intellectual property assets formally held by the AHC. Why would that language be in there if they weren't making a distinction? Your Honor, I guess I don't see the distinction, because ultimately the focus of the Federal Circuit's decision was that the General Creditor's Trust does not have the right to license. And they found that not only directly do they not have the right to issue settlement licenses, because only the at-home trust has that right, but they can't do it indirectly either by directing the at-home trust to issue licenses on behalf of the General Creditor's Trust. And that finding is based on the simple fact that under the plan documents, which is really the second issue I wanted to get into, which are unambiguous in our view, don't have to get into extrinsic evidence, under those documents, it's only the at-home trust that can issue licenses, because they are the owner of the patent. And if they issue licenses, the proceeds of those licenses are shared both by the bondholder's trust as well as the General Creditor's Trust. Let me ask, just to clarify this, I take it that you don't, that you feel there's a collateral estoppel by the Federal Circuit case, but you don't claim that we abound by it as we would, say, if it was a Supreme Court case. That would be up to us, and it might be persuasive. If I understand what Counsel's arguing, he doesn't dispute, I mean, the Federal Circuit held that the patent title holder holds the right to sell the patent, grant exclusive and non-exclusive licenses, grant the right to sub-licenses, transfer the rights that AHTL holds to another party. What he's saying is that, look, these folks under the trust were their boss. They're just holding it for us, and so if you wipe away all of the cover, we're really running the show, because that trust has to issue a license if we tell it to. So why can't we go ahead and do the litigation, if the settlement comes up that we're going to issue a license, we tell them to issue a license. So they say it doesn't matter. I don't expect the at-home trust to do anything when it comes to disposing of the assets of the at-home trust. And secondly, I do believe that the Federal Circuit addressed that issue as well, because in that court, the general creditor's trust made the argument that the at-home trust is just the bare title holder of the patents, and that implicit in that, it is the general creditor's trust that directs what it is that the at-home trust will do. And the Federal Circuit completely rejected that notion. They said that, no, you, the general creditor's trust, essentially have no substantive ownership rights in the patents at all. That's why you don't have standing. The only thing you have is the right to pursue infringement claims. At-home trust, on the other hand, you are the owner of the patent, you have the right to issue licenses and to collect the proceeds. They want to collect the proceeds from these licenses, not just to direct the at-home trust to issue them. They want all the money. And that's really the central dispute here. We don't believe that. Money is the problem. Money is always the problem in bankruptcy cases, yes, Your Honor. Yes, that's true. So what you're saying is, if I understand it correctly, that the Federal Circuit case may be interesting, but we still go back to the original settlement agreement and decide what it says under the California law. Well, Your Honor, we would like you to go a little bit further than that, in that we would like you to treat them as effectively collaterally stopped. They don't get the second chance at the, you know. I understand. But that case aside, that argument aside, your bottom line is it has nothing to do with our interpretation of the California, under the California law of the settlement agreement. That's what we're going to look to. That's the focus, right. And if you just look at the documents themselves, which is not just the committee settlement agreement, but it's also the plan, and it's also the creditor trust agreements and the confirmation order that approves all of this. You have to look at all of the documents together. And we believe that they are completely consistent and there's no ambiguity. Counsel, along that line, the appellants filed a motion to supplement the record to include the draft of the agreement. And you objected to that. What's the basis of your objection? The basis of our objection, Your Honor, is that the bankruptcy court did not consider that draft trust agreement. The district court did not consider that draft trust agreement. And as a matter of Ninth Circuit precedent, you cannot consider it either. But was it part of the record in the bankruptcy court? I guess they argue that it's part of the record because it was something filed of record in the bankruptcy case. This is a case that had literally thousands of docket entries. I don't think it's appropriate, I would argue, submit that it's not appropriate for them to simply attach the entire docket of the bankruptcy case and say, now we can pick and choose from the entire docket and figure out what's in the record on appeal, what's not on the record on appeal. But isn't it true that the entire record in the courts below are part of the record that we can consider? Well, technically, I think that's probably correct, Your Honor. What do you mean by technically? It's correct. I guess that's where I'm left. Yes, I guess I'll have to say it is correct, but our argument there, Your Honor, is that the bankruptcy judge did not consider that document. How do you know? It was not in front of him. How do you know? I only know that because it wasn't presented to him in the context of this dispute. What do you mean by presented? It was not presented to him in the context of this dispute. It wasn't attached as an exhibit. It wasn't presented at the hearing when we argued the underlying motion. We don't know whether he considered it or not for sure, but it was never. That's the point. How do you know that one of his beady-eyed clerks didn't go back and read it and tell him all about it? I guess that's always possible, Your Honor. Chances are, though, that did not happen. But it doesn't preclude us from considering it, though. It's in the record. As a district court judge, as a trial judge, often you review the whole record before you make a decision. Well, that's true. I'm not sure that the district court considered it. And it's not just the document itself. It's the argument. They didn't make the argument either at the bankruptcy court level or the district court level. But that's a different point than whether or not the record should be supplemented to include it. Then you have an argument that they should be precluded from making their argument here because it wasn't made before. But that has nothing to do with whether or not the record should be supplemented to include that document. That's true, Your Honor. And ultimately, I don't think that it's important, one way or the other. Because even if you include it as a technical matter in the record, you shouldn't consider it because it's extrinsic evidence. You don't need to... It can't be extrinsic evidence if it's part of the record. Well, it's extrinsic in the sense that you're just interpreting a contract. They're asking you to consider something outside of the four corners of the contract. In order to interpret the intent of the parties. And we're saying you don't need to do that. And as a matter of California law, there is no reason to do that or any basis to do that because the contract itself is unambiguous. Do you have any response to the allegation that B and G are the beneficial owners of the patents? Well, you ask the appellants' counsel to find the reference for you, and he couldn't. I don't think that he can because it's not in the document. There is nothing in the documents that says, under any circumstances, that G can direct A to dispose an asset of A, over the objection of the bondholder's liquidating trust or without even consulting with the bondholder's liquidating trust. And more, they say Spicone argues that AHLT merely holds bare legal title of the 647 patented trust for the benefit of GALT. They kind of brush that aside. That's right, Your Honor. In fact, I want to refer the Court to a provision in the at-home liquidating trust agreement that we did not cite in our papers, but which I think is important. It's section 3.3D. It's not to make an argument that hasn't been made before. Could I ask you, if both trusts decide they want your trust to execute a license, are you required to do it then? I'm sorry, Your Honor, I didn't catch that. If both trusts, both the bondholders and the unsecured creditors, direct you to execute a license, are you required to then? Direct the at-home trust? I represent the bondholders' trust. If we direct, if we both consent and direct, I think so, yes, because we are essentially the beneficial owners at the end of the day. But they can't do it, neither one can do it alone. They have to do it together. That's your view? That's right. And in fact, that's a direct, I want to quote this language from the at-home trust agreement because it's directly on point. That just nails it right there, I think. Because what G is arguing is that they can unilaterally direct the at-home trust to dispose of an asset that actually belongs to both the general creditors' trust and the bondholders' trust. So the argument here is the bondholders want to share in the proceeds of the license. That's exactly right. How much money are we talking about? What's the universe of money that we're talking about? $50? Maybe zero. Unfortunately, they've only commenced one patent infringement case, which was Microsoft, which was essentially shot down on appeal. And we commenced one, which was against AT&T, which has been settled without the issuance of settlement licenses. So we argued below, actually, that the dispute was not even ripe because there are no settlement licenses that are currently pending. It's a lot of time and money for maybe nothing. It is for something that may not be worth anything, but it may be worth something. So at this point, we would just urge the court to focus on the plan documents themselves. There really isn't anything in there that suddenly gives the at-home trust the ability to direct the at-home trust to do anything with respect to a disposition of property. And in fact, the dispute is very narrow, as I think one of your honors mentioned. All parties agree that the at-home trust owns the patents and is the only party that can issue licenses. In the absence of litigation, all parties agree that the at-home trust will collect all the proceeds from these licenses. There's nothing inherent in the structure of the plan that contemplates this kind of springing licensing right in the general creditor's trust. The at-home trust is not suddenly obligated to take direction from the general creditor's trust just because there's a dispute. It's not suddenly obligated to take direction from the general creditor's trust just because they want to settle a litigation or issue non-exclusive licenses solely for the benefit of the general creditors just because they are settling litigation. And then to give up all the proceeds from these licenses. There is nothing in the documents that contemplates that. And as I read before from that provision from the at-home trust, it appears to be directly contrary to what's contemplated in the document. There is also no distinction in the plan between exclusive versus non-exclusive licenses. That's a gloss that was added by the bankruptcy court and by the general creditor's trust. Nothing in the plan that makes that distinction. And they say it's fairly customary when you sue someone for patent infringement to issue a non-exclusive license. But a defendant in that litigation could just as easily demand an exclusive license or a transfer of the patents outright. There's nothing in the plan that makes this distinction for non-exclusive licenses. It's a random distinction. Section 4.2 of the at-home trust agreement, which Your Honor cited to before, that's the only document in all of these plan documents that expressly references the right to license. 4.2. 4.2, the at-home trust agreement. It's in the record at pages 690 to 691. And it expressly contemplates that the at-home trust has the power to liquidate the assets of the trust, which expressly includes the right to issue, quote, a license. Such as through the sale or license of assets. That's exactly it. Now, the other trust agreements, they use very similar language. They have the same basic form for their trust agreements. But the general creditors and the bondholders, there it only says sale. They can only dispose their assets through a sale. And that's because litigation cannot be licensed. It can be sold. It can be transferred. But it can't be licensed. Another point that the general creditors' trust make is that the at-home trust is there to follow the directions of the general creditors' trust. And that's not the case either. As I mentioned before, the Federal Circuit rejected that notion. The at-home trust is an independent fiduciary with a duty to maximize value of its assets. Not just intellectual property. They had a bunch of other assets. They were the umbrella trust because they got all the residual assets. It's inconsistent with the provisions of the plan to contemplate that the general creditors' trust could just direct the at-home trust in contravention of its fiduciary duty to bondholders to dispose of its assets. One point that the appellant's counsel just made was that they have the right to pursue infringement claims and to collect all proceeds. Proceeds of litigation, yes. Proceeds of disposing of at-home's assets, no. That's not within the concept of what proceeds meant to encompass under the plan documents. And, again, I would urge the Court to reject any reliance on extrinsic evidence. You just don't need to go there. The references to the disclosure statement, mediation proceeding, and this other draft document that was provided to the Court at the last minute, all of that is irrelevant to the issue that's in front of the Court today, which is the general creditors' request that the Court do something that is not contemplated in the documents, but that is in front of the Court today. Allow them to order another trust at the expense of the bondholders, that's the at-home trust, to dispose of its assets over our objection, expressly contrary to the plan documents, which say we have the right to consent before the at-home trust can dispose of its assets. Unless the Court has any further questions, I think I'll conclude early. All right, thank you. Thank you. A few very quick points. First, the plan provides that the at-home trust's assets are owned by the bondholder trust and the general unsecured creditors' trust, B&G, in Section H.I. And it's further provided in the at-home trust agreement in Section 1.1.A, which states that the bondholders' assets are owned by the general unsecured creditors' trust, B&G. In Section 1.1.A, the liquidating trustee agrees to accept and hold trust assets for the allowed bondholder claims and allowed general unsecured creditor claims. That's essentially the same thing, subject to the terms of the trust agreement. And it further provides in Section 3.3.G that the at-home trustee is subject to a duty to preserve the IP assets for B&G. So the structure that I described is the structure that applies here. Let me just touch very briefly on a couple of points that counsel raised in his argument. He points out that sales or dispositions of trust assets by A is subject to the consent of both B&G. And he argues that that actually favors his side of the argument here. In fact, it's quite the contrary. If my client can bring a patent suit and the cost of patent suits is currently running around $5 million, that's $5 million through trial on big cases. And on the courthouse steps, the defendant puts up the white flag and says, you got me. I want a license to settle. And that's what happens in the vast majority of cases. Were it the case that the bondholders could then come in and their consent was required to obtain a settlement, there would simply be no ability by G to pursue litigation on its part or B to pursue litigation on its part. What the provisions... Well, you know, it's interesting. The way that the bondholders settled their case, they brought a state court case against AT&T for breach of fiduciary duty and other things, just dismissed without prejudice the patent infringement case, and were told there was no consideration. I don't know how that all happened or what was going on between the parties there. But what I do know is that's no model for how to settle patent litigation. But at least it shows that one group can litigate without having the... You can absolutely litigate and you can absolutely settle if you're willing to settle your $5 million patent infringement case by accepting nothing and dismissing. But if the purpose of this, as it was, was to generate cash for at-homes creditors, the design here was to permit litigation by the bondholders and the general and secure creditors that would generate money. And the way patent litigation cases generate money is by forcing parties who are infringing to pay past damages and enter into a settlement for non-exclusives to covenants not to sue. We obtain the right to sue. It follows that we have the right to covenant not to pursue a specific right we were accorded under the agreements. That may well be the best way to handle litigation. But the parties can contract to do something that interferes with the best way to handle litigation. So how does that argument help us? California has the objective intent law in looking at this settlement agreement. How does it happen, how does it help us to say that they should have done something different, they should have done it better? They did it. They did everything they needed to do, Your Honor. They agreed that each party would have claims and causes of action. They agreed that to the extent necessary, each of the beneficiaries, B and G, could instruct A to cooperate in litigation and settlements. A is given the right under the A trust agreement to grant licenses, but there's nothing there that says that's only in connection with the license grant because they're the fee owner. Those provisions are completely consistent, but what you have to do here, where the underlying agreements, the settlement agreement and plan, talk about IP litigation and talk about proceeds, but are silent as to licenses, we have to look at the extrinsic evidence and ask the question, is it consistent with the purpose of these agreements, which was to generate money? I suppose it is and I suppose it isn't. My difficulty is you can make an agreement that's not of benefit to your client. It's what you agreed to that counts, not whether it's consistent with the best way to handle the situation. Well, but what we agreed to is absolutely consistent with what we're saying. We agreed that if we were to bring IP litigation, we would receive all the proceeds. And the proceeds of IP litigation in virtually all cases include a covenant not to sue, because in the absence of that, since each act of patent infringement creates a new cause of action, if you settle one case, you can file suit against that defendant the next day on a new case, and that doesn't make any sense. Contracts have to be interpreted reasonably to accomplish the purposes of the parties and they have to make common sense. And any other conclusion here, which would allow the bondholders' trust to basically hold our litigation hostage, simply doesn't make sense. All right. Thank you, counsel.
judges: Wallace, Trott, Rawlinson